THE NEWCASTLE AND ANDERSONTOWN TURNPIKE COMPANY
and Others *v.* BELL and Others.

It was not necessary, under the charter of the *Newcastle and Andersontown Turnpike Company,* that the whole amount of the capital, namely, 100,000 dollars, should be subscribed before the work was commenced.

After stock in said company to the amount of 300 dollars had been subscribed, directors were elected; and there was subsequently an additional subscription of stock, making the whole amount subscribed 23,000 dollars. *Held,* that, under these circumstances, the work might be commenced, &c.

*Held,* also, that in case of an illegal election of directors of said company, the remedy was at law.

APPEAL from the *Madison* Circuit Court.

PERKINS, J.—The appellees in this case filed a bill on the chancery side of the *Madison* Circuit Court, alleging that by an act of the legislature of this state, approved *January* 13, 1845, *Miles Murphy* and others his associates were constituted a corporation by the name of "*The Newcastle and Andersontown Turnpike Company,*" with all powers necessary and proper for carrying into effect the purpose for which the company was created; that that purpose was, as declared in the charter of incorporation, the construction of "a turnpike road from *Newcastle* in *Henry* county, by way of *Cadiz* in said county and *Columbus* in *Madison* county, to *Andersontown* in said county;" that the appellees were stockholders in that corporation. The bill sets out the charter

*Nov. Term, 1847.*

NEWCASTLE, &c., TURN- PIKE CO. v. BELL.

*Friday, March 24, 1848.*

Nov. Term,
1847.

Newcastle,
&c., Turn-
pike Co.
v.
Bell.

which (among other provisions not necessary to be here stated) contains these sections:

"Sect. 2. The capital stock of said corporation shall be 100,000 dollars, divided into shares of 25 dollars each, and said stock shall be personal property."

"Sect. 3. Said stock may be taken by any individual or corporation, and may be paid for in any kind of personal property or labour as may be agreed upon, and in such way and manner, and at such times and places, as shall from time to time be directed by said corporation."

"Sect. 6. So soon as may be deemed expedient after 300 dollars of the capital stock is subscribed, said commissioners shall appoint a time and place for holding an election for five directors, each of whom shall be a stockholder to the amount of at least two shares; said commissioners shall in all things manage such election and give proper certificates to the persons elected, who shall hold their office for one year, and until their successors are elected and qualified."

Sect. 16 enacts that the company shall commence the construction of the road within five years from the granting of the charter, but allows ten years for the completion of it. A failure in either of these particulars subjects the charter to forfeiture.

The bill states that before the second *Monday* in *August*, 1845, 300 dollars of stock had been subscribed, and that on that day *David Pickering* and four other persons were elected directors of the company pursuant to the charter, who, in the year following, located the road; that on the second *Monday* in *August*, 1846, a second election of directors took place, at which *Eli Murphy* and four other persons were chosen, who, during their official year, procured subscriptions of stock, which, with the amount before obtained, made an aggregate of 23,000 dollars; that they could obtain no more, and that in all human probability 100,000 dollars of stock never can be raised.

The bill further alleges that the appellees subscribed their shares on an understanding with other stockholders, and on assurances, that the proposed road from *Andersontown* to *Newcastle* would be extended, by another company, from the latter place to some point on the *White Water Canal;* and that

Nov. Term,
1847.

NEWCASTLE,
&c., TURN-
PIKE Co.
v.
BELL.

the expectation thus raised was one of the strong induce-ments to their subscription of said shares; whereas it had now happened that such extension of the road had been aban-doned by the company expected to make it, and, therefore, should the stockholders in the road named in the charter un-der consideration be compelled to pay their money for its construction, that money would be "thrown away upon a work that would be useless." It is stated that the appellees, prior to the annual election for directors on the second *Mon-day* in *August*, 1847, had become opposed to the further pro-secution of the *Newcastle and Andersontown Turnpike;* that its prosecution or abandonment was made the question in that election; that directors favourable to its prosecution were elected, as the appellees believe, against the wish of a ma-jority of the stockholders, by the wrongful admission of votes for the candidates favourable to prosecution, and the wrong-ful rejection of votes offered for the opposing candidates; and that the directors thus illegally elected were proceeding to let out the work, and threatening to collect the stock subscribed.

The bill prays an injunction.

The Circuit Court granted an injunction, restraining all proceedings in the prosecution of the work, or for the collec-tion of the stock subscribed, till the amount of stock taken should be 100,000 dollars, unless the Court should subsequently order differently; and thereupon an appeal was taken by the company to this Court.

The decision of the Court below in granting the injunction must be sustained, if at all, upon one or more of three grounds:

1. That the subscription of stock to the amount of 100,000 dollars was a condition precedent to the company's commenc-ing the construction of the road.

2. That there was an abuse of their trust by the directors.

3. That the directors being illegally chosen were subject to be restrained, by a Court of equity, from acting in any man-ner in the premises.

As to the first ground; the subscription of the entire amount of capital stock, authorized by the charter of the company, is not made in terms, in the act of incorporation, a condition precedent to the commencement of operations under it; nor are we able to discover any thing in the provisions of that

act, or any principle of law or of justice, that requires us to make it such a condition by construction (1). The 6th section authorizes an election of directors of the company so soon as 300 dollars of stock are subscribed. Now, it seems to us, as there is nothing restrictive on that point in the charter, that the company, after such an election at least, must be in perfect existence and complete organization; and being so, it is empowered by sect. 10 to construct the road in question; and to enable it to do so, sect. 11 authorizes it to enforce the payment of all stock subscribed, at such times and places, and in such proportions, as the directors may deem expedient. Sect. 16 makes it obligatory on the company to commence the work in five years, though ten are given for its completion.

Here, then, is a corporate body with a certain but less amount of capital stock than it is entitled to, possessing a discretionary authority in the matter expressly conferred by its charter, entering upon the performance of the work for the doing of which it was created, and the Court interferes and arrests its progress; and the question is, why? and the answer given by counsel is, that a section of its charter says "that the capital stock of said corporation *shall* be 100,000 dollars;" that that therefore is to be taken as the sum the undertaking of that corporation will cost; that that amount of stock is not subscribed; and that it would be hazardous to the rights of others to permit a commencement of operations with less. In this answer we do not concur. Construing all the provisions of the charter together, we are of opinion that the word "shall," in the section quoted, should be regarded as giving permission to create 100,000 dollars of stock, and not as compelling to do so; that it has the same import as the word "may" would have, were it used. This is no unwarrantable exercise of the duty of construction. Nor do we now admit (nor do we deny) that, because the amount of stock authorized by the charter is 100,000 dollars, we are hence to presume the work designated in it will cost that sum. Charters for turnpikes are obtained before the routes for them are located, or the costs of their construction estimated, and the cost of any given one depends upon the character of road adopted, the route selected, the time chosen for its construction, and other contingencies, all generally determined after

Nov. Term,
1847.

NEWCASTLE,
&c., TURN-
PIKE CO.
v.
BELL.

the procurement of the charter. The amount provided for in it may perhaps be regarded as the highest conjectural sum the work will cost.

But suppose we are to presume, in the absence of any showing to the contrary, that the road will cost 100,000 dollars in this case, still we see no reason why operations upon it should be suspended till the whole amount is subscribed. The company has ten years in which to complete the work, and it is certainly not unreasonable to suppose that in a thriving country like that through which the route of the turnpike lies, additional stock can be raised in that time; and that it can be, is not denied by the bill; and every mile of the road constructed may be of utility, perhaps of profit, in the intermediate time, and may also operate as an inducement to additional subscriptions of stock.

A good turnpike in a settled and business country cannot be a "useless work."

2. We do not think a commencement of operations, upon a part of the authorized capital stock in this case, so certainly an abuse of discretion on the part of the directors, and necessarily so dangerous to the interests of the stockholders, as to require a Court to decide, upon such considerations, that it should not be made.

And, turning from the charter, and the single fact of the commencement of operations as alleged, to the other extrinsic facts set forth in the bill, we discover nothing that satisfies us that the action of the corporation should be arrested. It is shown that 23,000 dollars of stock are subscribed, and it is not shown what amount will be required to complete the road. It is said 23,000 dollars will not, and that 100,000 dollars will do it, but how much more than the lesser sum will be required, or how much less than the greater will suffice, is not stated. 25,000 dollars may be sufficient.

No abuse is alleged in the manner of conducting operations by the directors, and the only complaint is that they proceed at all without the 100,000 dollars of stock. This we have seen they may do.

The alleged fraudulent representations are not shown to have been made by the company, and are not relied on by counsel here.

Under this view of the case, we are of opinion, on the third point, that if the directors are illegally in office, the remedy is at law as to that.

*Per Curiam.*—The decree is reversed with costs. Cause remanded, &c.

*J. Davis, D. Kilgore,* and *J. S. Newman,* for the appellants.
*O. H. Smith* and *T. L. Sullivan,* for the appellees.

Nov. Term, 1847.

(1) There is the following case upon this subject: The act establishing a particular company provided, that "the whole of the said sum of 100,000*l.*" (the estimated expense of the works) "shall be subscribed before any of the powers and provisions given by the act shall be put in force." The company made a call on the shares before the subscriptions were complete, and commenced an action for the call after they were so. It was held that the action was not sustainable, the subscription of the 100,000*l.* being necessary to enable the company to make the call, as well as to bring the action. *The Co. of Proprietors, &c.* v. *Theobald.* 1 Mood. & Malk. 151.